ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL DE APELACIONES
**PANEL ESPECIAL**

| | | |
|---|---|---|
| **LUIS HÉCTOR RODRÍGUEZ NAVARRO**<br>**AIDA DEL TORO FRONTERO**<br>QUERELLANTE(S)-RECURRIDA(S)<br><br>V.<br><br>**CAR AUTO, INC.**<br>QUERELLADA(S)-RECURRENTE(S) | **KLRA202300214** | *REVISIÓN DE DECISIÓN ADMINISTRATIVA*<br>procedente del<br>Departamento de Asuntos del Consumidor (DACo)<br><br>Caso Núm.<br>**SAN-2021-0010064**<br><br>Sobre:<br>Compraventa de Motor |

Panel integrado por su presidenta, la Juez Cintrón Cintrón, la Juez Barresi Ramos y el Juez Adames Soto.[1][2]

*Barresi Ramos*, juez ponente.

## SENTENCIA

En San Juan, Puerto Rico, hoy día 13 de mayo de 2025.

Comparece ante este Tribunal de Apelaciones, **CAR AUTO, INC.** (**CAR AUTO**) mediante un *Recurso de Revisión* instado el 12 de mayo de 2023. En su escrito, nos solicita que revisemos la *Resolución* dictada el 17 de marzo de 2023 por el DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR (DACo). Mediante la referida determinación, DACo declaró ha lugar la *Querella* solicitando la rescisión del contrato de compraventa del vehículo de motor Nissan Pathfinder del año 2017.[3]

Exponemos el trasfondo fáctico y procesal que acompaña a la presente controversia.

## – I –

El 11 de junio de 2021, los señores **LUIS HÉCTOR RODRÍGUEZ NAVARRO** y **AIDA DEL TORO FRONTERA** (matrimonio **RODRÍGUEZ-DEL TORO**) adquirieron del

---

[1] En virtud de la *Orden Administrativa OATA-2025-019* de 10 de febrero de 2025, el Juez Figueroa Cabán sustituyó a la Jueza Rivera Pérez quien cesó de ejercer funciones en el Tribunal de Apelaciones.

[2] En virtud de la *Orden Administrativa OATA-2025-068* de 7 de mayo de 2025, el Juez Adames Soto sustituyó al Juez Figueroa Cabán quien cesó de ejercer funciones en el Tribunal de Apelaciones.

[3] La *Resolución* fue notificada y archivada en autos el 17 de marzo de 2023. Apéndice del *Recurso de Revisión*, págs. 27- 51.

concesionario **CAR AUTO** dos (2) vehículos de motor: *Ford-Escape SE* del año 2017 y un *Nissan Pathfinder SV* del año 2017.[4] Ese mismo día, el matrimonio **RODRÍGUEZ-DEL TORO** recibió los documentos de información sobre *Garantía y Condiciones* para los vehículos y copia del *Reglamento de Garantías de Vehículos de Motor*.

Así las cosas, el 12 de junio de 2021, el matrimonio **RODRÍGUEZ-DEL TORO** culmino los trámites relacionados a la compraventa del *Nissan Pathfinder* y se llevaron el automóvil para su hogar.[5] Al transcurrir dos (2) semanas, el matrimonio **RODRÍGUEZ-DEL TORO** se comunicó con el concesionario **CAR AUTO** alegando ciertos desperfectos respecto al *Nissan Pathfinder*. Como resultado, obtuvieron una cita para el 15 de julio de 2021.[6] Días después, **CAR AUTO** habló para la entrega del *Nissan Pathfinder*, pues corrigió los desperfectos en cuanto al baúl, pedal de frenos y la emergencia de mano.[7]

Posteriormente, el 10 de agosto de 2021, el matrimonio **RODRÍGUEZ-DEL TORO** acudió nuevamente al taller de mecánica de **CAR AUTO**. En esa ocasión, manifestó que había problemas con la transmisión. El concesionario **CAR AUTO** se quedó con la unidad para su evaluación por lo que le entregaron un auto prestado.[8]

Mientras las reclamaciones del matrimonio **RODRÍGUEZ-DEL TORO** se estaban atendiendo por **CAR AUTO**, el 13 de octubre de 2021, presentaron una *Querella* ante DACo.[9] En esencia, interpelaron la rescisión del contrato de compraventa por vicios ocultos y la devolución total del dinero pagado.[10] No obstante, el 1 de noviembre de 2021, **CAR AUTO** entregó el vehículo reparado.

El 4 de abril de 2022, el señor José Torrón Martínez, técnico de investigación de DACo, realizó una primera inspección al vehículo *Nissan Pathfinder* y, rindió

---

[4] Apéndice del *Recurso de Revisión*, pág. 52. Al momento de la compraventa, el automóvil objeto de la presente controversia, *Nissan Pathfinder* 2017, contaba con un millaje de 61,222 y su precio final de compraventa fue de $21,495.00.

[5] Conforme al *Reglamento de Garantías de Vehículo de Motor*, la guagua *Nissan Pathfinder* ostentaba una garantía de dos (2) meses o 2,000 millas, lo que ocurriera primero.

[6] El 15 de julio de 2021, el vehículo fue dejado en el taller para su evaluación y reparación.

[7] Apéndice del *Recurso de Revisión*, pág. 32.

[8] Según la *Resolución* del DACo, el matrimonio **RODRÍGUEZ-DEL TORO** indicó que, al preguntar por su unidad, **Car Auto** le informó que tuvieron que llevarlo a un taller externo, pues Nissan es el "dealer" autorizado para evaluar sus vehículos y emitir un diagnóstico certero respecto a los abanicos, bobinas y transmisión.

[9] Apéndice del *Recurso de Revisión*, págs. 53- 60.

[10] Apéndice del *Recurso de Revisión*, pág. 54.

un *Informe de Inspección*.[11] Al momento de esta inspección, el *Nissan Pathfinder*

contaba con unas 63,913 millas y después de la prueba contó con 63,929. Los

resultados de la inspección:

> (1) A/C no funciona. (2) Freno de emergencia averiado. (3) Puerta
> trasera no [cierra], pero muestra deficiencia en el enganche ["Latch"].
> (4) Parachoques trasero esta rallado. (5) Vidrio lado chofer sube y baja
> deficientemente. (6) Panel decorativo de la puerta chofer muestra
> picadura, (7) El bonete muestra leves picaduras. (8) Leves picaduras en
> lado de las puertas pasajero; tanto en la de adelante como la de atrás.
> (9) Solicite una evaluación "O.B.D.II On Board Diagnostic" y mostró el
> siguiente código. Present-P17F1- CVT Judder C/V Inspección.
> Su opinión: los defectos son reparables. Estimado: Los costos de
> reparación pueden ser más que el costo del vehículo en el mercado.

Oportunamente, el 11 de mayo de 2022, **CAR AUTO** presentó su *Contestación*

*a Querella*.[12] En síntesis, replicó que el matrimonio **RODRÍGUEZ-DEL TORO** tuvo la

oportunidad de hacer una prueba de carretera, así como también de llevarlo a un

técnico automotriz de su preferencia, por tanto, aseguran haber brindado un

servicio óptimo.

Más adelante, el 19 de julio de 2022, el señor José Torrón Martínez, técnico

de investigación de DACo, realizó una segunda inspección y rindió *Informe de*

*Inspeccion*.[13] En esta ocasión, el vehículo reflejaba 64,872 millas y al culminar la

prueba presentó 64,875 millas recorridas. Los resultados de esta inspección:

> (1) A/C no funciona, pero le realizaron una reparación de reemplazar
> una manga y repararon el acondicionador de aires. (2) Freno de
> emergencia estaba averiado, pero en presencia mía realizando un ajuste
> y estos quedaron bien en la prueba de carreteras. (3) Puerta trasera la
> [cierre] alrededor 12 doce veces y solamente en una ocasión quedo
> suelta del ["Latch"]. Esta es eléctrica y la encontré en esta ocasión bien.
> (4) Parachoques trasero esta rallado. (5) Vidrio lado chofer ahora sube
> y baja más rápido que el del otro extremo. (6) Panel decorativo de la
> puerta chofer muestra picadura, (7) El bonete muestra leves picaduras.
> (8) Leves picaduras en lado de las puertas pasajero tanto en la de
> adelante como la de atrás. (9) Solicite una evaluación "O.B.D.II On
> Board Diagnostic" y mostró el siguiente código. Present-P17F1- CVT
> Judder C/V Inspección. (10) El vehículo mostró una muy leve vibración
> en bajas revoluciones (Relanti). Extraje el elemento de filtrado de
> admisión de motor y mostró estar extremadamente tupido por falta de
> mantenimiento. Una vez se remplaza el filtro de admisión de aire en el
> motor se requiere también una des carbonización de la mariposa de
> admisión de aire en el motor. Esto se debe realizar cada 12,000 millas
> corridas.
> Su opinión: "los defectos son reparables". Realice una búsqueda en la
> página web "NHTSA" y surge que el fabricante del auto no ha

---

[11] *Íd.*, págs. 65- 68.
[12] Apéndice del *Recurso de Revisión*, págs. 69- 74.
[13] *Íd.*, págs. 75- 80.

realizado una campaña de seguridad en el auto. Favor de ir a un concesionario de NISSAN y realizar una cita para su evaluación".[14]
Estimado: Los costos de reparación pueden ser más que el costo del vehículo en el mercado.

En enero 2023, el matrimonio **RODRÍGUEZ-DEL TORO** acudió a **AUTO CENTRO NISSAN** por un – *recall* - del manufacturero.[15] Así, le reemplazaron la transmisión al *Nissan Pathfinder* objeto de esta controversia.[16]

En seguida, los días 6 y 28 de febrero de 2023, se celebraron las audiencias adjudicativas en las cuales se desfiló prueba y testificó el señor Yemal Hernández, técnico automotriz de **CAR AUTO**, y el señor José Torrón Martínez, técnico de investigación de DACo. Consecuentemente, el 17 de marzo de 2023, DACo dictaminó la *Resolución* recurrida. En su decisión, formuló las siguientes cuarenta y cinco (45) determinaciones de hechos:

1. La parte querellante se identifica como Luis Héctor Rodríguez Navarro y Aida del Toro Frontera, casados entre sí, mayores de edad, con dirección postal: PO BOX 366545, San Juan, PR 00936-6545, y correo electrónico: aida.deltoro@hotmail.com. Representados por el Lcdo. Carlos A. Piovanetti Dohnert,
2. Aida Del Toro Frontera, le mostró al Departamento que puede obrar por sí misma, se presume su capacidad.
3. La parte querellada se identifica como CarAuto, Inc., corporación autorizada hacer negocios en PR, con número de registro: 354771, y dirección postal: PO BOX 9021803, San Juan, PR 00902-1803. Representada por el Lcdo. Milton Portalatín.
4. La parte querellante deseaba adquirir dos vehículos para su uso personal, por tal razón, luego de ver algunos vehículos del concesionario de la parte querellada a través de su página online, a principios de junio de 2021, se contactó con una vendedora y quedaron en que la parte querellante pasaría por el concesionario para ver los vehículos.
5. El 10 de junio de 2021, la parte querellante acudió personalmente al concesionario, hablaron con la vendedora y se le indicó que los vehículos elegidos estaban en buen estado [Ford Escape SE, del año 2017] y [Nissan Pathfinder SV, del año 2017]. Ambos vehículos fueron manejados – probados, por la parte querellante.
6. Según la Orden de Compra de CarAuto, con fecha del 11 de junio de 2021, la parte querellante adquirió un vehículo usado, Nissan- Pathfinder, del año 2017, tablilla IYJ– 867, con 61,222 millas.
7. La parte querellante, el día de la transacción, firmó en el concesionario de la parte querellada los documentos de información sobre Garantía y

---

[14] Destacamos que, en la captura de pantalla en la *Opinión*, notamos que el *Vehicle Identification Number* (VIN) del *Nissan Pathfinder* 2017 posee *Unrepaired Recalls* de 9 de noviembre de 2019. Apéndice del *Recurso de Revisión*, pág., 79.
[15] Un *"recall"* se define como un retiro voluntario del fabricante de un vehículo, equipo, pieza, *car seat* o llanta crea un riesgo irrazonable y deja de cumplir con las normas mínimas de seguridad. La mayoría de las decisiones de los fabricantes para hacer un retiro y corregir un defecto de seguridad se hace voluntariamente antes de cualquier participación de la *National Highway Traffic Safety Administration* (NHTSA). Además, los fabricantes están obligados a corregir el problema reparándolo, reemplazándolo, ofreciendo un reembolso o en raras ocasiones, recomprando el vehículo. Véase: *National Highway Traffic Safety Administration* of US Department of Transportation.
[16] Apéndice del *Recurso de Revisión*, págs. 83- 84.

Condiciones para el Vehículo, y la Copia de Reglas del Reglamento de Garantías de Vehículos de Motor.

8. El vehículo ostentaba una garantía de 2 meses o 2,000 millas, lo que ocurriera primero, a tenor con el Reglamento de Garantías de Vehículos de Motor de este Departamento.

9. Según la Orden de Compra de CarAuto, con fecha de 11 de junio de 2021, la unidad adquirida por la parte querellante tenía un valor por la cantidad de $21,495.00. En adición, la Orden de Compra de CarAuto, expresa que por concepto de tablilla se le cobraría al comprador la cantidad de $499.00.

10. Según el recibo núm. 1120, de Car Auto Inc., con fecha del 12 de junio de 2021, la parte querellante pagó la cantidad de $21,495.00, por el vehículo Nissan– Pathfinder 2017, con el cheque núm. 1338215.

11. En el momento de la transacción, se le cobró a la parte querellante la cantidad de $499.00, en concepto de DOC FEES, según el recibo núm. 1117, con fecha del 11 de junio de 2021, de Car Auto Inc.

12. En adición, en el momento de la transacción se le cobró a la parte querellante la cantidad de $199.50, en concepto de FULL COVER, según el recibo 1118, de CarAuto con fecha del 11 de junio de 2021.

13. El 11 de junio de 2021, la parte querellante se llevó del concesionario la Ford-Escape SE, del año 2017. Al próximo día pasarían a recoger la Nissan Pathfinder SV, del año 2017, ya que estaban terminando los arreglos para pagar el vehículo.

14. Toda alegación de los problemas que alegó la parte querellante de la Ford-Escape SE, del año 2017, fueron objetados por la parte querellada, ya que dicho vehículo fue reparado eficientemente por la parte querellada y está en buen funcionamiento actualmente.

15. El 12 de junio de 2021, la parte querellante completó la transacción de la Nissan Pathfinder SV, y se la llevaron a su hogar.

16. Las alegaciones de la parte querellante sobre que el vehículo Nissan Pathfinder SV, del año 2017, era parte de un flete, fueron objetadas, y anotada la objeción, ya que estas alegaciones no fueron parte de la querella original, ni de la enmienda.

17. Luego de 2 semanas de que la parte querellante tuviera en su poder la Nissan Pathfinder SV, esta comenzó a tener algunos problemas [ruidos duros en el motor, ruido en el tren delantero, al correrla presentaba un fallo, se quedaba sin fuerza, se aguantaba al correrla, le pareció a la parte querellante un problema de trasmisión, el *muffler* hacia un ruido, fallo en el pedal de frenos, la emergencia– freno de mano, no funcionaba, y el baúl no abría - con o sin beeper].

18. La parte querellante llamó al concesionario, explicó los problemas que presentaba la Nissan Pathfinder SV, y le dieron cita para mediados de julio de 2021.

19. El 15 de julio de 2021, la parte querellante dejó en el taller de la parte querellada la Nissan Pathfinder SV, para las debidas reparaciones.

20. Alrededor de 3 días después, la parte querellada se comunicó con la querellante para que recogiera su vehículo. La querellante reclamó que si en tan poco tiempo habían reparado todos los problemas que presentó el vehículo. Le indicaron que se había reparado el baúl, el pedal de frenos y la emergencia– freno de mano; los ruidos y el fallo no fueron reparados porque el vehículo no los presentó en el taller.

21. En este momento la querellante expresó su molestia, ya que un vehículo recién comprado, en buenas condiciones, como le habían dejado saber, no lo había podido usar para el propósito que fue comprado, para que el hijo de la parte querellante viajara a la Universidad de Mayagüez, PR.

22. Los problemas mecánicos no fueron reparados adecuadamente por la parte querellada.

23. Teniendo el vehículo en su posición, la querellante notó los mismos problemas mecánicos, intentó grabar videos para mostrarlos en el taller de la parte querellada.

24. Por los problemas presentados, la parte querellante utilizaba el vehículo en tramos cortos, cerca de su área limítrofe. A modo de prueba, la parte querellante condujo el vehículo por tramos más largos, para Mayagüez, y notaron que tenía un fallo, se quedaba sin fuerzas, hacía ruidos en el motor, no pasaba de 40– 45 millas, al bajar cuestas e intentar frenar el vehículo

temblaba, cuando se aplicaba el freno de mano– emergencia, si había inclinación en la carretera la unidad se iba hacia delante o hacia atrás, en adición al estacionarse los querellantes notaron que salía un ruido del tren delantero. Todos estos problemas fueron notificados a la parte querellada y la parte querellante le dejó saber que le llevaría el vehículo urgentemente.

25. Para principios de agosto de 2021, la querellante le envió unos videos con los ruidos que percibía del vehículo al jefe de los mecánicos.

26. El 10 de agosto de 2021, la parte querellante dejó la unidad en el taller de la parte querellada. Explicó todos los problemas que le presentó el vehículo y expresó que de haber sabido todos los problemas que tenía el vehículo, no lo hubiera adquirido. En esta ocasión, la querellante probó el vehículo con el jefe de los mecánicos y le explicó todo lo que hacia la unidad.

   a. Al paso de una semana, la querellante llamó a la parte querellada para saber el *status*. Le dejaron saber que los desperfectos no los presentaba siempre la unidad, que les diera más tiempo para seguir examinándola y saber qué exactamente estaba causando los problemas.

   b. El 18 de agosto de 2021, le entregaron a la querellante un vehículo, prestado, en lo que podían arreglar su unidad.

   c. El 7 de septiembre de 2021, la parte querellada se comunicó con la querellante para indicarle que le tenían que cambiar el vehículo que le prestaron por otro. La querellante le dejó saber que el vehículo prestado también presentó ciertos problemas. Al preguntar por su unidad, le indicaron que la llevaron a un taller externo, que tenía más conocimiento en Nissan, y se le había diagnosticado problemas en abanicos, bobinas y transmisión. La querellante reclamó el por qué no le habían notificado de que se llevarían la unidad a un taller externo ni la tenían al tanto de la situación con su vehículo. El vehículo que le prestaron en esta ocasión a la querellante fue cambiado, ya que ésta le notificó a la parte querellada algunos problemas que tenía el vehículo.

   d. Para el 16 de septiembre de 2021, la querellante llamó para saber el *status* y le informaron que le estaban cambiando las bobinas y abanicos, y que la transmisión que llegó no era la correcta, que se tenía que verificar si en PR había disponible, sino tenían que pedir otra en EE. UU.

   e. Para finales de septiembre de 2021, llamaron a la querellante para notificarle que le tenían que cambiar nuevamente la unidad prestada. La querellante preguntó nuevamente por el *status* de su vehículo, le indicaron que en PR no había la transmisión, y como tardaba 30 días pedirla a EE.UU., habían decidido llevar la unidad a otro taller para [reparar] la transmisión que tenía la unidad. La querellante volvió a reclamar el por qué no le habían notificado de que se llevarían la unidad a otro taller externo ni la tenían al tanto de la situación con su vehículo. En adición, le dejó saber al jefe de mecánicos que deseaba cancelar el contrato y devolver el vehículo.

   f. Para esta fecha, 27 de septiembre de 2021, el dueño del concesionario, Manuel Portalatín, se comunicó por primera vez con la parte querellante. Éste le indicó a la querellante que todas las decisiones tomadas fueron para su beneficio, para arreglar su vehículo. La querellante le recordó a Manuel Portalatín, que luego de haber pasado 2 semanas desde la compra de la unidad, había enfrentado varios problemas [los antes mencionados]. Que no había podido disfrutar la unidad desde su compra, ya que desde que la compró había estado mucho tiempo en el taller. La querellante le reclamó al Sr. Portalatín, el por qué no le habían notificado que se llevarían la unidad a talleres externos y por qué no la tenían al tanto de la situación con su vehículo. La querellante le dejó saber al Sr. Portalatín, que deseaba rescindir del contrato, que ya no quería que se le devolviera la unidad, quería su dinero de vuelta. A lo que el Sr. Portalatín, alegó que no procedía la rescisión del contrato, que le tenía que dar oportunidad de hacerle las reparaciones. La querellante se quedó firme en que quería rescindir del contrato, a lo que el Sr. Portalatín, le contestó que lo más que

podía hacer era cambiarle la unidad. La querellante no aceptó, se quedó firme en su decisión de querer devolver el vehículo y que se le devolviera su dinero.

g. Posteriormente, la querellante intentó comunicarse en varias ocasiones con el Sr. Portalatín, para dejarle saber que su decisión no había cambiado, que deseaba rescindir del contrato y no tuvo contestación de su parte.

27. En todas las ocasiones que la querellante se comunicaba con la parte querellada para conocer el *status* de su unidad, dejaba saber su disgusto por haber adquirido un vehículo en malas condiciones y notificó en varias ocasiones que quería devolver el vehículo y que se le devolviera su dinero.

28. Por tal razón, la querellante radicó la querella de epígrafe el 13 de octubre de 2021.

29. Para el 1 de noviembre de 2021, la parte querellada le entregó a la querellante su vehículo. Le hicieron la entrega de la unidad en su residencia.

a. Una vez la querellante recibió el vehículo, notó que la unidad tenía algunos problemas en la pintura [rayada-raspada] lado izquierdo y derecho, bonete y baúl, aire acondicionado no enfriaba bien, el cristal del lado izquierdo estaba bajando bien lento, los asientos sucios.

b. Luego de las reclamaciones hechas por la querellante al representante de la parte querellada, éste le entregó una hoja que solamente decía que se le había puesto una trasmisión nueva.

c. Se le entregó a la querellante para que firmara el Invoice 1931 de CarAuto [hoja sin anotaciones], como único documento entregado con la labor realizada, el cual decía: "instalación de transmisión y programación".

d. Mientras la querellante verificaba el documento para firmarlo, encontró el recibo con fecha del 31 de agosto de 2021, y el Conduce Garantía con fecha del 10 de agosto de 2021 [ambos, solo con anotaciones hechas a mano].

e. En este momento la querellante reclamó ya que estos documentos eran incongruentes entre sí, uno decía transmisión nueva y otro, transmisión usada.

f. La querellante le reclamó al representante de la parte querellada, que fue a entregar el vehículo, el por qué no le habían entregado los documentos de los trabajos realizados al vehículo [hojas de servicio]. La querellante estuvo alrededor de 2 horas en llamada telefónica con representantes de la parte querellada, para saber los trabajos que le habían realizado a su vehículo y el por qué no le habían entregado algún documento de los trabajos realizados, de manera detallada. La querellante reclamaba sobre la garantía de los trabajos realizados, la parte querellada no le pudo explicar cuánto tiempo de garantía tenían los trabajos realizados a la querellante en su vehículo [le indicaron que no tenían garantía, luego que tenía 1 mes, luego 3 meses de garantía y luego 6 meses].

g. En medio de la llamada telefónica, se le envió a la querellante por email el Estimado 1933 de CarAuto, y el Estimado e Invoice 1932 de CarAuto [Exhibit IX].

h. La querellante no firmó el Invoice 1931, ya que no tenía un desglose de los trabajos realizados y no decía término de garantía. La querellante hizo unas anotaciones en el Invoice 1931 [hoja con anotaciones], para que se lo entregaran al Sr. Portalatín. En adición, la querellante envió al Sr. Portalatín una carta con fecha del 1 de noviembre de 2021, dirigida a Manuel Portalatín, que también se la notificó por email, sobre su descontento con la entrega del auto, sus quejas al recibir el vehículo luego de 3 meses y no en óptimas condiciones, y que no renunciaba a su deseo de rescindir del contrato como antes se lo había indicado, ni a su querella en DACO.

30. Al tener el vehículo consigo, y poder inspeccionarlo más detalladamente, la parte querellada notó los siguientes desperfectos: ruidos en el motor, "temblequeo" de la unidad, el baúl no funciona adecuadamente, ruidos en motor/muffler continuaban, los jalones de la transmisión, dificultad al

acelerar, se aguantaba, se quedaba sin fuerza, emergencia-freno de mano floja, ruido en el tren delantero, humo banco salía del muffler, cristal del conductor no funciona adecuadamente, pintura dañada, pintura rayada, y aire acondicionado no funcionaba.

31. La querellante estuvo privada del uso y disfrute de su unidad desde agosto hasta noviembre de 2021.

32. La parte querellante no pagó cantidad alguna de dinero por las reparaciones hechas por la parte querellada.

33. Los problemas mecánicos no fueron reparados adecuadamente por la parte querellada.

34. La enmienda presentada por la parte querellante el 10 de marzo de 2022, la suscribiente la notificó a las partes el 4 de mayo de 2022, por correo electrónico [querella, enmienda y prueba], según constaba en el expediente administrativo. La enmienda fue [notificada] con toda la prueba presentada por la parte querellante. La alegación de la parte querellada de no haber recibido la enmienda en su totalidad y los anejos [prueba], no procede ya que consta la notificación hecha a esta parte por correo electrónico. Por lo que la reclamación de devolución de la cantidad pagada en concepto de tablilla fue admitida.

35. La primera Inspección del auto objeto de la controversia se llevó a cabo el 4 de abril de 2022. El Informe de Inspección fue notificado a las partes el 25 de abril de 2022. El 10 de mayo de 2022, la parte querellada, por conducto de su representante legal, presentó moción impugnando el informe de inspección. Los hallazgos del Inspector fueron los siguientes: "[e]l vehículo [mostró los] siguientes problemas: AC no funciona. Freno de emergencia [está] averiado. Puerta trasera [cierra], pero muestra deficiencia en el enganche "latsh". Parachoques trasero [está rayado]. Vidrio lado chofer sube y baja deficientemente. Panel decorativo de la puerta chofer muestra picadura. El bonete muestra leves picaduras. Leves picaduras en lado de las puertas pasajero tanto en la de adelante como la de atrás. Solicité una evaluación "O.B.D.II On Board Diagnostic" y [mostró] el siguiente código: "present – P17F1 – CVT Judder C/V Inspección". Este código se refiere que hubo o tiene presente, problemas en la transmisión. El vehículo entró a la inspección con 63,913 millas y luego de la prueba de carretera salió con 63,929 millas.

36. La segunda Inspección del auto objeto de la controversia se llevó a cabo el 19 de julio de 2022. El Informe de Inspección fue notificado a las partes el 3 de agosto de 2022. El 22 de agosto de 2022, la parte querellada, por conducto de su representante legal, presentó moción impugnando parcialmente informe de inspección. Los hallazgos del Inspector fueron los siguientes: "[e]l vehículo [mostró los] siguientes problemas: A/C no funciona, pero realizaron una reparación de reemplazar una manga y repararon el acondicionador de aires. Freno de emergencia estaba averiado, pero en presencia mía realizando un ajuste y estos quedaron bien en la prueba de carreteras. Puerta trasera la cerré alrededor 12 doce veces y solamente en una ocasión [quedó] suelta del "latsh". Esta es eléctrica y la encontré en esta ocasión bien. Parachoques trasero [está rayado]. Vidrio lado chofer ahora sube y baja más rápido que el del otro extremo. Panel decorativo de la puerta chofer muestra picadura. El bonete muestra leves picaduras. Leves picaduras en lado de las puertas pasajero tanto en la de adelante como la de atrás. [Solicité] una evaluación "O.B.D.II On Board Diagnostic" y [mostró] el siguiente código: "present – P17F1 – CVT Judder C/V Inspección". El vehículo [mostró una muy leve vibración en bajas revoluciones (Relanti). Extraje el elemento de filtrado de admisión del motor y [mostró] estar extremadamente tupido por falta de mantenimiento. Una vez se remplaza este filtro de admisión de aire en el motor se requiere también una descarbonización de la mariposa de admisión de aire en el motor. Esto se debe realizar cada 12,000 millas corridas". Este código se refiere que hubo o tiene presente, problemas en la transmisión. El vehículo entró a la segunda inspección con 64,872 millas y luego de la prueba de carretera salió con 64,875 millas.

37. Luego de culminar la segunda inspección, el concesionario hizo unas reparaciones en el throttle y filtro. Se le dio unos documentos a la querellante para que está los firmara y ésta se negó a firmarlos.

38. La parte querellante no usaba de manera continua la unidad ya que la misma continuaba con los desperfectos mecánicos antes mencionados.

39. Para diciembre de 2022, la parte querellante utilizó el vehículo y la unidad se quedó. No cogía el cambio de drive ni reversa, no se ponía en marcha, hacía ruido. Por tal razón, tuvo que utilizar los servicios de remolque vehicular para llevarla a su residencia. Posteriormente, la parte querellante utilizó los servicios de remolque vehicular, en enero de 2023, para dejar su vehículo en AutoCentro Nissan, para que se le realizaran unas reparaciones, a los problemas que presentaba el vehículo, mismos problemas que la parte querellada alegó haber reparado en noviembre de 2021.

40. Algunos de estos trabajos fueron cubiertos por garantía extendida-recall, y otros fueron pagados por la parte querellante. Otros diagnósticos no fueron autorizados por la parte querellante ya que eran muy costosos, como el problema de la compuerta del baúl [querellante no autorizó la reparación, ya que era muy costosa].

41. Al Departamento le mereció entera credibilidad la alegación de la querellante, en cuanto, a que tuvo que llevar su unidad a otro taller para que se le hicieran las reparaciones que la parte querellada alegó haber realizado.

42. En la Vista, la parte querellante presentó evidencia nueva, se le dio la oportunidad a la parte querellada de suspender la vista para que evaluara la nueva evidencia y estar adecuadamente preparada, a lo que la parte querellada no aceptó, decidió continuar con la Vista, luego de examinar la nueva evidencia.

43. Manuel Portalatín, para récord:

    a. Aceptó que los documentos de las reparaciones no se le entregaron a la querellante el día que le fueron a entregar la unidad a su residencia, ya que la parte querellante no fue personalmente a buscar la unidad al taller de la parte querellada.

    b. También aceptó para récord Manuel Portalatín, que el Invoice 1931, dice transmisión nueva, pero a la unidad no se le instaló una transmisión nueva, sino que repararon la que tenía la unidad.

44. Al vehículo de la querellante se le hicieron las siguientes reparaciones en el taller de la parte querellada: transmisión, bobinas, abanicos. Reparaciones que no fueron hechas debidamente, ya que la unidad continuó presentando los mismos problemas.

45. Las reparaciones hechas por la parte querellada, a la unidad de la querellante, no fueron hechas correctamente ya que la unidad continuó presentando problemas hasta dejar a la querellante en diciembre de 2022, sin poder aplicar el cambio de drive ni reversa, no se ponía en marcha la unidad, y continuaba con el ruido.

En desacuerdo, el 10 de abril de 2023, CAR AUTO presentó *Reconsideración*.[17]

El 12 de abril de 2023, notificada ese mismo día, se expidió *Resolución en Reconsideración* declarando no ha lugar dicho petitorio y dejando en pleno vigor su dictamen anterior.[18]

Insatisfecho, el 12 de mayo de 2023, CAR AUTO acudió ante este foro intermedio mediante el *Recurso de Revisión* señalando el(los) siguiente(s) error(es):

Erró el Departamento de Asuntos del Consumidor, por medio de la

---

[17] Apéndice del *Recurso de Revisión*, págs. 81- 95.
[18] Íd., págs. 96- 99.

Honorable Juez, cuando ésta en su resolución realiza determinaciones de hechos con relación al vehículo Ford Escape que no es objeto de controversia.

Erró el Departamento de Asuntos del Consumidor por conducto de la Honorable Juez Administrativa cuando teniendo evidencia pericial de la agencia toma en consideración testimonio lego para resolver una controversia que se debe tener conocimiento técnico.

Erró el Departamento de Asuntos del Consumidor al concluir que era responsabilidad del dealer realizar la reparación de la transmisión cuando lo cierto es que la misma fue reemplazada por un recall del manufacturero.

Erró el Departamento de Asuntos del Consumidor cuando resuelve el presente caso utilizando la doctrina de vicios ocultos cuando lo cierto es que se trata de un caso por servicios en garantía problemas de manufactura que fue resuelto por ellos.

Erró el Departamento de Asuntos del Consumidor por conducto de la Juez Administrativa cuando ésta emite resolución parcializada, con manifiesto perjuicio en contra del concesionario. Aún más, se demuestra la parcialidad y perjuicio, cuando la reconsideración a la resolución fue resuelta por la Directora Regional. Persona que no tuvo inherencia alguna en la apreciación de la prueba, en las vistas celebradas, siendo ésta la agencia misma y no el ente revisor.

El 16 de mayo de 2023, pronunciamos *Resolución* en la cual, entre otras cosas, concedimos un plazo de treinta (30) días al matrimonio RODRÍGUEZ-DEL TORO para presentar su(s) alegato(s) en oposición al recurso. En consonancia, el 16 de junio de 2023, el matrimonio RODRÍGUEZ-DEL TORO presentó su *Alegato en Oposición al Recurso de Revisión*.

Evaluado concienzudamente el expediente del caso; habiendo dado la debida consideración a la transcripción de la prueba oral (TPO); y contando con el beneficio de la comparecencia de ambas partes; nos encontramos en posición de resolver. Puntualizamos las normas de derecho pertinentes a la(s) controversia(s) planteada(s).

## – II –

### - A - *REVISIÓN JUDICIAL*

La *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAU) provee un cuerpo de reglas mínimas para gobernar los procesos de adjudicación y reglamentación en la administración pública.[19] Su sección 4.1

---

[19] Conocida como la Ley Núm. 38 de 30 de junio de 2017, según enmendada, 3 LPRA § 9601-9713; *SLG Saldaña-Saldaña v. Junta*, 201 DPR 615, 621 (2018).

instituye la *revisión judicial* por este Tribunal de Apelaciones de las determinaciones finales de las agencias.[20]

La *revisión judicial* tiene como propósito limitar la discreción de las agencias y asegurarse de que estas desempeñen sus funciones conforme a la ley.[21] El criterio rector al momento de pasar juicio sobre una decisión de un foro administrativo es la *razonabilidad* de la actuación de la agencia.[22] Nuestra evaluación de la decisión de una agencia se circunscribe, entonces, a determinar si esta actuó de forma arbitraria, ilegal o irrazonable, o si sus acciones constituyen un abuso de discreción.[23]

Empero, las decisiones de los organismos administrativos especializados gozan de una presunción de legalidad y corrección, por lo que, sus conclusiones e interpretaciones merecen gran consideración y respeto.[24] Por ello, al ejecutar nuestra función revisora, este Tribunal está obligado a considerar la especialización y experiencia de la agencia, distinguiendo entre cuestiones de interpretación estatutaria —sobre las que los tribunales son especialistas— y cuestiones propias de la discreción o pericia administrativa.[25] Ello implica que los dictámenes de los entes administrativos merecen deferencia judicial.[26]

Ahora bien, tal norma no es absoluta. Nuestro más alto foro ha instaurado que no podemos dar deferencia a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho.[27] Particularmente, concretó las normas básicas sobre el alcance de la *revisión judicial* al expresar:

> [L]os tribunales deben dar deferencia a las decisiones de una agencia administrativa, pero ésta cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando

---

[20] 3 LPRA § 9671.

[21] *Torres v. Junta Ingenieros*, 161 DPR 696, 707 (2004). Véase, además Javier A. Echevarría Vargas, *Derecho Administrativo Puertorriqueño*, Ediciones Situm (2017), págs. 304- 306.

[22] *Fonte Elizondo v. F & R Const.*, 196 DPR 353 (2016); *Otero v. Toyota*, 163 DPR 716 (2005). D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 2da ed., Bogotá, Ed. Forum, 2001, pág. 543.

[23] *Pérez López v. Depto. Corrección*, 208 DPR 656, 660 (2022).

[24] *Transporte Sonnell, LLC v. Junta de Subastas*, 2024 TSPR 82; 214 DPR ___; *Torres Rivera v. Policía de PR*, 196 DPR 606, 625- 626 (2016); *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 891 (2008).

[25] *OCS v. Point Guard Ins.*, 205 DPR 1005, 1028 (2020).

[26] *DACo v. Toys "R" Us*, 191 DPR 760, 765 (2014).

[27] *Torres Rivera v. Policía de PR, supra.*

determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales. Es importante destacar que, si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos procede que se valide la interpretación que realizó la agencia administrativa recurrida.

Primordialmente, el alcance de la *revisión judicial* de las determinaciones administrativas se ciñe a determinar lo siguiente: (1) si el remedio concedido por la agencia fue el apropiado; (2) si las determinaciones de hecho de la agencia están basadas en *evidencia sustancial* que obra en el expediente administrativo, y (3) si las conclusiones de derecho fueron las correctas.[28]

En cuanto a las determinaciones de hechos, estas serán sostenidas por los tribunales si están respaldadas por *evidencia sustancial* que surja del expediente administrativo considerado en su totalidad.[29] La *evidencia sustancial* es aquella relevante que una mente razonable puede aceptar como adecuada para sostener una conclusión.[30] Debido a la presunción de regularidad y corrección que cobija a las decisiones de las agencias administrativas, quien alegue ausencia de *evidencia sustancial* debe presentar prueba suficiente para derrotar dicha presunción.[31] Para ello "tiene que demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración".[32] De modo que no podrá basarse únicamente en simple alegaciones. A esto se le conoce como la norma de la *evidencia sustancial,* con la cual se persigue evitar sustituir el criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor.[33] Por lo tanto, aun cuando exista más de una interpretación razonable de los hechos, el tribunal debe dar deferencia a la agencia, y no sustituir su criterio por el de esta.[34]

---

[28] Sección 4.5 de la LPAU, 3 LPRA § 9675; *OEG v. Martínez Giraud,* 210 DPR 79 (2022).
[29] *Rolón Martínez v. Supte. Policía,* 201 DPR 26, 36 (2018).
[30] *Otero v. Toyota, supra,* pág. 728.
[31] *Graciani Rodríguez v. Garaje Isla Verde,* 202 DPR 117, 128 (2019).
[32] *Gutiérrez Vázquez v. Hernández y otros,* 172 DPR 232, 244 (2007).
[33] *Pacheco v. Estancias,* 160 DPR 409, 432 (2003).
[34] *Íd.*

De otro lado, las conclusiones de derecho de la agencia son revisables en todos sus aspectos, sin sujeción a norma o criterio alguno.[35] Así, debemos dar deferencia a las interpretaciones que los organismos administrativos hacen de las leyes y reglamentos que administran. Es por ello que, ante casos dudosos, donde pueda concebirse una interpretación distinta de estas leyes y reglamentos, la determinación de la agencia merece deferencia sustancial.[36]

En resumen, si la decisión recurrida es razonable y se sostiene en la *evidencia sustancial* que obra en el expediente administrativo, procede su confirmación.[37] A *contrario sensu*, los tribunales revisores podemos intervenir con la decisión recurrida cuando no está basada en *evidencia sustancial*, o cuando la actuación es arbitraria, irrazonable o ilegal, o cuando afecta derechos fundamentales así como fuera del marco de los poderes que le fueron delegados mediante su ley creadora o habilitadora.[38] Del mismo modo, el Prof. Echevarría Vargas ha apuntalado que las decisiones de las agencias gubernamentales no deben ser "revocadas o modificadas salvo que conste una actuación arbitraria, ilegal o irrazonable".[39]

### - B - *DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR (DACo)*

La *Ley Orgánica del Departamento de Asuntos del Consumidor* creó al **DACo** como la agencia administrativa encargada de proteger y salvaguardar los derechos del consumidor.[40] En consecuencia, se implantó una estructura de adjudicación administrativa con plenos poderes para resolver las controversias ante su consideración y concesión de los remedios pertinentes conforme a derecho.[41] De esta forma, la Asamblea Legislativa le adjudicó la responsabilidad de velar por el cumplimiento de todas las leyes concernientes a los derechos de los

---

[35] *Rebollo v. Yiyi Motors*, 161 DPR 69, 77 (2004).
[36] *Torres Santiago v. Depto. Justicia*, 181 DPR 969, 1002 (2011).
[37] *García Reyes v. Cruz Auto Corp.*, supra, pág. 893.
[38] *Hernández Feliciano v. Municipio de Quebradillas*, 211 DPR 99 (2023); *Capó Cruz v. Jta. Planificación et al.*, 204 DPR 581 (2020); *JP, Plaza Santa Isabel v. Cordero Badillo*, 177 DPR 177 (2009).
[39] Echevarría Vargas, J. A., *Derecho Administrativo Puertorriqueño*, 5ta. ed. Rev., San Juan, Ed. Situm, 2023, pág. 340.
[40] Ley Núm. 5 del 23 de abril de 1973, según enmendada. 3 LPRA § 341b *et seq.*
[41] 3 LPRA § 342 e(d); *Ortiz Rolón v. Armando Soler Auto Sales, Inc.*, 202 DPR 689, 696 (2019).

consumidores.[42] Como parte del cumplimiento con su misión, se le facultó al secretario del **DACo** la promulgación del *Reglamento de Procedimientos Adjudicativos.*[43] Su propósito principal es "asegurar la solución justa, rápida y económica de las querellas presentadas ante o por el Departamento y proveer un procedimiento uniforme para su adjudicación".[44]

A este tenor, el secretario del **DACo** creó el *Reglamento de Garantías de Vehículos de Motor (Reglamento).*[45] Este *Reglamento* rige la venta y/o servicios de vehículos de motor nuevos o usados en Puerto Rico. Uno de los propósitos principales de esta reglamentación es proteger a los consumidores que invierten en la adquisición de automóviles, y procurar que estos sirvan para los propósitos para los cuales fueron adquiridos, y tengan las condiciones mínimas necesarias para garantizar la protección de la vida y propiedad.[46]

En cuanto a la garantía de los vehículos de motor usados, la Regla 26 del aludido *Reglamento* enuncia:

> Regla 26: Vehículos de Motor Usados
> 26.1 – Se prohíbe vender un vehículo de motor usado sin garantía.
> 26.2 – Todo vendedor de vehículos de motor usados, concederá garantía, en piezas y mano de obra. Esta garantía será a base del millaje recorrido y según la siguiente escala:
> a) Hasta 36,000 millas – cuatro (4) meses o cuatro mil (4,000) millas, lo que ocurra primero.
> b) Más de 36,000 millas y hasta 50,000 millas- tres (3) meses o tres mil (3,000) millas, lo que ocurra primero.
> **c) Más de 50,000 millas y hasta 100,000 millas – dos (2) meses o dos mil (2,000) millas, lo que ocurra primero.**[47]
> 26.3 – El comprador tendrá derecho a que la unidad sea inspeccionada por un mecánico de su preferencia, antes de comprar el vehículo usado.

En lo pertinente, la Regla 29.3 del citado *Reglamento* 7159 prescribe las obligaciones del vendedor al proveer servicio de reparación en garantía a un vehículo de motor usado. Sobre la reparación de defectos, dispone que:

> El Departamento, **podrá a opción del consumidor, decretar la resolución del contrato o reducir proporcionalmente su precio de venta de acuerdo a las disposiciones del Código Civil de Puerto**

---

[42] *Íd.*

[43] *Reglamento* Núm. 8034, Departamento de Asuntos del Consumidor. (Aprobado el 14 de junio de 2011).

[44] *Reglamento* Núm. 8034, Departamento de Asuntos del Consumidor. (Aprobado 13 de junio de 2011), pág. 1.

[45] *Reglamento* Núm. 7159, Departamento de Asuntos del Consumidor. (Aprobado 1 de junio de 2006), pág. 2.

[46] *Íd.*, págs. 1- 2.

[47] *Íd.*, págs. 25- 26. (énfasis nuestro).

**Rico** en aquellos casos en que el vendedor o su representante, dentro de los términos de la garantía, tuvo **oportunidad razonable** para reparar uno o más defectos, pero no quiso o no pudo corregirlos. Lo que constituye oportunidad razonable de reparar se determinará tomando en consideración las circunstancias particulares de cada caso. (Énfasis nuestro).[48]

El *Reglamento* Núm. 7159 hace la salvedad de que ninguna disposición de este, limitará el derecho del consumidor para ejercer cualquier acción reconocida en las leyes de nuestro ordenamiento, así como aquellas sobre saneamiento por vicios ocultos o redhibitoria y otras reconocidas en el Código Civil de Puerto Rico.[49]

### - C - Vicio Redhibitorio y Saneamiento

En nuestro ordenamiento jurídico, todo vendedor está obligado a la entrega y saneamiento de la cosa objeto de la venta, aunque ignorase los defectos ocultos.[50] Lo cual conlleva que el vendedor tenga la obligación de garantizar al comprador la posesión pacífica y útil de la cosa vendida y a su vez, responder por los vicios o defectos ocultos que tuviere.[51] El adquirente puede optar por reclamar la subsanación o reparación de los defectos; la entrega de un bien equivalente; o resolver total o parcialmente el contrato.[52] Para que proceda una acción de saneamiento por vicios ocultos, el Máximo Foro ha establecido que deben estar presente los siguientes requisitos: (1) el defecto de la cosa vendida no sea de conocimiento del adquirente; (2) dicha imperfección sea grave o suficientemente importante que haga que la cosa sea impropia para el uso que se le destinó; (3) dicho desperfecto sea preexistente a la venta; y (4) se ejercite la acción en el plazo legal de seis (6) meses contados desde la entrega de la cosa vendida.[53]

---

[48] *Íd.*, págs. 29- 30. *Ortiz Rolón v. Armando Soler Auto Sales, Inc., supra.* El Código Civil de Puerto Rico de 2020 establece que la resolución total (del contrato) **solo procede** si la evicción o el defecto (de la cosa) recaen sobre un aspecto determinante para la adquisición del bien. Por ejemplo, en caso de evicción, el comprador también tendría derecho al resarcimiento de daños sufridos, salvo que haya actuado con negligencia. Refiérase: 31 LPRA § 9853. (énfasis nuestro).

[49] *Íd.*, a la pág. 35.

[50] Art. 1261 del Código Civil de Puerto Rico de 2020, 31 LPRA § 9851.

[51] Art. 1263 del Código Civil de Puerto Rico de 2020, 31 LPRA § 9853.

[52] *Íd.*

[53] *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 890-891 (2008). En reiteradas ocasiones, el Tribunal Supremo de Puerto Rico ha resuelto que dicho plazo "comienza a transcurrir no desde la fecha de perfección del contrato, sino desde el momento que cesan las gestiones de inteligencia entre las partes". *Polanco v. Cacique Motors*, 165 DPR 156, 166 (2005) [citando a *Ferrer v. General Motors*, 100 DPR 246,256 (1971); *Casa Jaime Corp. v. Castro*, 89 DPR 702 (1963)].

Cónsono con lo anterior, en *Ford Motor Co. v. Benet*, nuestro más Alto Foro sostuvo que procede una acción redhibitoria por vicios ocultos en vehículos de motor defectuosos, cuando el "...comprador logra probar que el automóvil que compró no funcionaba en forma normal y que el vendedor tuvo oportunidad de corregir los defectos y no pudo o no los corrigió".[54]

En cuanto a la revisión sobre la apreciación de la importancia del defecto por el foro inferior, nuestro Tribunal Supremo reiteró que:

> [L]a apreciación de la importancia del defecto, para resolver la procedencia de la acción redhibitoria, es esencialmente una cuestión de hecho, justificándose, por lo tanto, **nuestra intervención con la discreción del juzgador sólo en aquellos casos que acusen una ausencia de prueba adecuada o la comisión de error manifiesto en su apreciación.**[55]

En ese contexto, un vicio redhibitorio se define como "el defecto oculto en el bien transmitido a título oneroso, existente al tiempo de la adquisición, que hace impropio al bien para su destino o disminuye de tal modo su utilidad que, de haberla conocido, el adquirente no le habría dado menor por él".[56] Al mismo tiempo, el ordenamiento jurídico considera también un vicio redhibitorio: (a) aquel especialmente acordado como tal por las partes; (b) aquel que el transmitente garantiza que no existe; y (c) la ausencia de calidad convenida. En ese sentido, el transmitente responderá, aunque ignore la existencia del vicio redhibitorio.[57]

Ahora bien, si por el contrario el defecto de la cosa no es de tal magnitud como para mermar su utilidad o habilitar la garantía por vicios redhibitorios, puede subsanarse mediante la doctrina del error. Es decir, en ese escenario, las partes podrían extender el concepto de defectos ocultos mediante pacto y subsanarlo.[58]

- III -

---

[54] 106 DPR 232, 238 (1977). (énfasis nuestro). Reiterado en *Polanco v. Cacique Motors, supra*, pág. 168.

[55] *García Reyes v. Cruz Auto Corp., supra.* [Citando a *García Rivera v. Ciudad Chevrolet, Inc.*, 110 DPR 158,162 (1980); *DACO v. Marcelino Mercury, Inc.*, 105 DPR 80,84 (1976)]. (énfasis nuestro).

[56] Art. 1267 del Código Civil de Puerto Rico de 2020, 31 LPRA § 9871.

[57] *Íd.* (énfasis nuestro).

[58] Refiérase: Miguel R. Garay: *Memorial Explicativo; Código Civil de Puerto Rico 2020 y su historial legislativo*, Ediciones SITUM., pág. 930 (2020).

En el caso de autos, en resumen, nos corresponde evaluar si DACo incidió al declarar *ha lugar* la reclamación ejercida por el matrimonio **RODRÍGUEZ-DEL TORO**; conceder la rescisión del contrato de compraventa al amparo de la doctrina de vicios ocultos; ordenar a **CAR AUTO** devolver el dinero del precio pagado por la unidad *Nissan Pathfinder;* si hubo parcialidad y perjuicio al resolverse la reconsideración por la Directora Regional de DACo. De igual manera, nos corresponde concluir si un concesionario que se dedica a la venta de autos usados, como **CAR AUTO**, tiene responsabilidad de reparar un vehículo de motor con un *"recall"* por parte del fabricante independientemente tengan o no conocimiento.

En primer lugar, **CAR AUTO** señaló en su escrito que el DACo erró al realizar determinaciones de hechos con relación al vehículo *Ford Escape*, pues este no era objeto de controversia. Ciertamente, al evaluar el expediente del caso y en particular, las determinaciones de hechos formuladas por el ente administrativo notamos:

> #5: "El 10 de junio de 2021, la parte querellante acudió personalmente al concesionario, hablaron con la vendedora y se le indicó que los vehículos elegidos estaban en buen estado [Ford-Escape SE, del año 2017] y [Nissan Pathfinder SV, del año 2017]. Ambos vehículos fueron manejados-probados, por la parte querellante".
>
> #14: "Toda alegación de los problemas que alegó la parte querellante de la Ford- Escape SE, del año 2017, fueron objetados por la parte querellada, ya que dicho vehículo fue reparado eficientemente por la parte querellada y está en buen funcionamiento actualmente."[59]

La señora **DEL TORO FRONTERA** manifestó en múltiples ocasiones haber tenido problemas no tan solo con el vehículo *Nissan Pathfinder* objeto de la *Querella*, sino también con el Ford Escape.[60] Aun así, la *Querella* no contiene alegación alguna referente al Ford Escape. A pesar de ello, en sus declaraciones, alegó que el automóvil Ford Escape presentó problemas y ruidos en el tren delantero a los dos o tres días de haberla adquirido, por lo que, fueron al concesionario en busca de un servicio y estos ordenaron la pieza correspondiente.[61]

---

[59] Apéndice del *Recurso de Revisión*, pág. 32.
[60] *Íd.*, págs. 53– 64.
[61] *Transcripción Prueba Oral de Vista Administrativa* (TPO), 6 de febrero de 2023, págs. 65– 66.

Incluso, cuando el licenciado Piovanetti Dohnert le preguntó a la señora **DEL TORO**

**FRONTERA** sobre el remedio que solicita esta respondió:

> [Y]o solicito rescindir del contrato, eh, la devolución de todo dinero invertido y reclu... en la guagua, en arreglo, todo. Yo he..., he..., he..., he pagado seguro, he pagado licencias, el..., el..., la cantidad de licencia adicional porque el carro dice diferente costo. Eh, los cuatrocientos novent[a] [y] nueve por cada vehículo, incluyendo la Ford Escape y la Nissan Pathfinder...[62]

En lo concerniente a ese señalamiento, entendemos que le asiste la razón a

**CAR AUTO**. Aunque, en esencia, el mismo día y en el mismo concesionario, el

matrimonio **RODRÍGUEZ-DEL TORO** adquirió ambos vehículos de motor, la realidad

es que, al incluir el Ford Escape como parte de la *Resolución Administrativa*, y en

particular, como una determinación de hecho podría encauzar a una apreciación

incorrecta de la prueba y, por tanto, inducir a error. Toda vez que el Ford Escape

en específico no forma parte de las alegaciones contenidas en la *Querella*. Por

tanto, procede modificar la determinación de hecho #5 para eliminar lo relativo al

Ford Escape y eliminar la determinación de hecho #14.

Los restantes señalamientos de error por estar dirigidos a impugnar la

determinación del DACo serán discutidos conjuntamente.

**CAR AUTO** punteó que la agencia administrativa erró al conferirle

credibilidad al testimonio de la señora **DEL TORO FRONTERA** pese a no ser perito.

**CAR AUTO** indicó que las reparaciones mecánicas que estaban bajo su

responsabilidad fueron resueltas oportunamente, y que, por tanto, no existen

vicios ocultos. Replicó que hubo parcialidad y perjuicio al resolver la

reconsideración por conducto de la Directora Regional por esta no haber tenido

inherencia alguna en las audiencias y prueba aquilatada.

La señora **DEL TORO FRONTERA** arguyó que ante sus constantes

reclamaciones y el mal funcionamiento del automóvil podía reclamar la devolución

del dinero mediante una acción redhibitoria, eligiendo la resolución del contrato.

Al momento de la adquisición del *Nissan Pathfinder* y acorde al Reglamento

Núm. 7159, el matrimonio **RODRÍGUEZ-DEL TORO** tuvo la oportunidad de realizar

---

[62] TPO, pág. 137.

una prueba de manejo ("Test Drive") y una inspección independiente del automóvil con un técnico automotriz de su preferencia. En el testimonio de la señora **DEL TORO FRONTERA**, ésta aseveró que "dimos vuelta a la manzana".[63]

Debemos tener presente, que, en este caso, el señor José Torrón Martínez, técnico de investigación del DACo, realizó dos (2) inspecciones al vehículo de motor: 4 de abril de 2022 y 19 de julio de 2022. En este segundo *Informe de Inspección*, se adujo que la mayoría de los hallazgos fueron corregidos, reparados y/o remplazados por **CAR AUTO**, entre ellos, el acondicionador de aire (A/C), el freno de emergencia, el "latch" de la puerta trasera, y vidrio lado chofer. En conformidad con la prueba testifical y documental, debemos colegir que **CAR AUTO** evaluó y reparo el vehículo *Nissan Pathfinder* según algunos de los hallazgos y señalamientos del matrimonio **RODRÍGUEZ-DEL TORO**.

En cuanto al resto de los desperfectos hallados, tales como las picaduras en la pintura en el panel decorativo de la puerta del chofer, bonete y puertas de pasajero; y los problemas en las revoluciones que están estrechamente relacionados con la transmisión, quedaba así pendiente los problemas contenidos en los incisos 9 y 10.[64] Precisamente determinó que percibió una muy leve vibración en bajas revoluciones y extrajo el elemento de filtrado de admisión del motor, mostraba estar extremadamente tupido por falta de mantenimiento. Asimismo, manifestó que requiere una des carbonización de la mariposa de la admisión de aire en el motor, la cual se debe realizar cada 12,000 millas corridas.[65]

Evidentemente, la unidad *Nissan Pathfinder*, presentó problemas en la trasmisión. En el segundo *Informe de Inspección*, el señor Torrón Martínez, técnico de investigación del DACo, hizo alusión a que realizó una búsqueda en la página web de la Administración Nacional de Seguridad del Tráfico en las Carreteras (National Highway Traffic Safety Administration- NHTSA) del Departamento de Transporte de los Estados Unidos y *no* surgía de que se hubiese efectuado una

---

[63] TPO, 6 de febrero de 2023, págs. 50- 55.
[64] TPO, 28 de febrero de 2023, págs. 21- 33.
[65] Apéndice del *Recurso de Revisión*, pág. 78.

campaña de seguridad (retiro) pero apercibió que debían acudir a un concesionario de NISSAN y realizar una cita para su evaluación. A pesar de ello, al examinar la página web unida al antedicho *Informe de Inspección* conteniendo el número de identificación del vehículo (NIV en ingles VIN- Vehicle Identification Number) **si** surgía que el vehículo *Nissan Pathfinder* tenía un *"unrepaired recall"* pendiente desde el 9 de noviembre de 2019.[66]

Más, es de conocimiento que cuando existe una campaña de seguridad (retiro), emitida por Administración Nacional de Seguridad del Tráfico en las Carreteras es el fabricante quien debe hacerse cargo de la reparación sin costo alguno para el propietario.[67] Los fabricantes están llamados a notificarle a los propietarios registrados por correo de primera clase dentro de un plazo de sesenta (60) días posteriores a la notificación de la NHTSA. Ello implica que el fabricante, mediante sus concesionarios, tiene la obligación legal de corregir el defecto de seguridad que provocó la campaña de seguridad (recall). Cuando el propietario recibe tal notificación, debe ponerse en contacto con el concesionario local autorizado por el fabricante para coordinar cita. Por ende, en este caso, habiendo existido una campaña de seguridad era un concesionario *Nissan* autorizado quien está facultado para reemplazar la(s) pieza(s) en la campaña de seguridad (recall).

Igualmente, la Comisión Federal de Comercio (Federal Trade Commission) recomienda a los consumidores que **antes de comprar un vehículo de motor,** realice una inspección independiente del automóvil y una búsqueda con el Número de Identificación del Vehículo (VIN) de la NHTSA, para que conozca si un vehículo en específico requiere reparaciones como parte de una campaña de retiro (*"recall"*).[68]

Por tratarse de una interpretación de la ley, las conclusiones de derecho de una agencia son revisables en su totalidad por este tribunal. En consecuencia,

---

[66] *Íd.,* pág. 79.

[67] Las campañas de seguridad pueden estar relacionadas a asientos de bebes; cinturones de seguridad; neumáticos; bolsas de aire; y tecnología de asistencia al conductor.

[68] Véase https://consumidor.ftc.gov/destacado/desctacado-s0040-comprar-un-carro-usado. (énfasis nuestro).

colegimos que el fallo del DACo al interpretar la ley que le corresponde implementar no fue razonable. Son hechos incontrovertidos que: (1) el segundo *Informe de Inspección* del DACo fue notificado el 3 de agosto de 2022; (2) **CAR AUTO** objetó parcialmente el segundo *Informe de Inspección* dentro del plazo de quince (15) días; y (3) el aludido *Informe de Inspección* **no** comprueba que "[...] el problema de la transmisión es un defecto mayor que hace impropio al bien para su destino y disminuye su utilidad. Un vehículo de motor con problemas en la transmisión disminuye o destruye su valor o la aptitud para su uso ordinario o convenido.[...] En la transacción hecha por la parte querellante, los defectos presentados por el vehículo son considerados por este Departamento como vicios ocultos. "[69]

El segundo *Informe de Inspección* contiene la opinión del perito expresando: "los defectos son reparables". Ello luego de haber realizado una prueba de carretera. Tampoco se hizo alusión alguna a que el vehículo de motor no pudo ser conducido o manejado hasta el lugar donde se realizó la inspección y de regreso. Lo cual implica que el mismo no era inservible o el impropio para su destino.

Por otra parte, en la susodicha *Resolución*, el DACo hizo constar que tuvo ante sí la *Orden de Compra* fechado 11 de junio de 2021 (Exhibit XII) concerniente al vehículo de motor adquirido por el matrimonio **RODRÍGUEZ-DEL TORO**. La *Orden de Compra* refleja el cobro de la cantidad de $499.00 **por concepto de tablilla**.[70] En concreto, **no** hay controversia sobre el cobro de $499.00 por concepto de tablilla. El *Reglamento* del DACo es claro y decreta que solo se puede cobrar lo que dictamina el Departamento de Transportación y Obras Públicas (DTOP): $244.00 en automóviles, así que cualquier cuantía cobrada en exceso de $244.00 se considera un cobro ilegal.

- IV -

Por los fundamentos antes expuestos, *modificamos* inciso 3 de la *Orden* contenida en la *Resolución* emitida el 17 de marzo de 2023 por el Departamento de Asuntos del Consumidor (DACo) a los fines de que **CAR AUTO** deberá desembolsar

---

[69] Apéndice del *Recurso de Revisión*, págs. 46- 47.
[70] Apéndice del *Recurso de Revisión*, pág. 52.

la suma de **$255.00** a favor del matrimonio **RODRÍGUEZ-DEL TORO** dentro del plazo de treinta (30) días; *revocamos* el resto de la mencionada *Resolución* y *desestimamos* la *Querella* interpuesta el 12 de junio de 2021 por el matrimonio **RODRÍGUEZ-DEL TORO**.

**Notifíquese inmediatamente.**

Lo acordó el Tribunal, y lo certifica la Secretaría del Tribunal de Apelaciones.

La Jueza Cintrón Cintrón concurre con el resultado sin opinión escrita. El Juez Adames Soto disiente con el resultado mediante opinión escrita.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

| | | |
|---|---|---|
| LUIS HÉCTOR RODRÍGUEZ NAVARRO, AIDA DEL TORO FRONTERO<br>Recurridos<br><br>v.<br><br>CAR AUTO, INC.<br>Recurrente | KLRA202300214 | Revisión Judicial procedente del Departamento de Asuntos del Consumidor (DACo)<br><br>Caso Núm. SAN-2021-0010064<br><br>Sobre: Compraventa de Motor |

Panel integrado por su presidenta, la Juez Cintrón Cintrón, la Juez Barresi Ramos y el Juez Adames Soto

## VOTO DISIDENTE DEL JUEZ NERY E. ADAMES SOTO

Respetuosamente difiero del juicio de mis respetadas compañeras juezas de Panel, pues juzgo que la determinación aquí alcanzada transgrede el carácter de revisión limitado que nos corresponde ejercer ante las determinaciones de los organismos administrativo, a la vez que ignora la jurisprudencia relativa a la clara política pública de proteger a los consumidores de vehículos de motor nuevos y usados, frente a los intereses de los vendedores. *Rebollo v. Yiyi Motors*, 161 DPR 69 (2004).

a.

En su primer señalamiento de error la parte recurrente de epígrafe se limitó a cuestionar la determinación de hechos decimocuarta que surge de la *Resolución* recurrida. En dicha determinación de hechos se indicó lo siguiente: *Toda alegación de los problemas que alegó la parte querellante de la Ford Escape SE, del año 2017, fueron objetados por la parte querellada, ya que dicho vehículo fue reparado eficientemente por la parte querellada y está en buen funcionamiento*[1].

---

[1] Apéndice del recurso de revisión judicial, págs. 31-32.

A partir de la determinación de hechos citada el recurrente **especula** que *se puede <u>presuponer</u> que el dealer vende vehículos defectuosos, <u>inferencia perjudicial</u> en detrimento de dicho negocio*[2]. (Subrayado provisto). El carácter puramente especulativo de esta aseveración bastaba para descartar la teoría legal que el recurrente trató de impulsar. Simplemente, en la *Resolución* recurrida no se incluyó, de manera alguna, una expresión generalizada sobre la venta de vehículos defectuosos en el *dealer*, (como especula el recurrente), sino que precisó todos los defectos que sí mostró un vehículo en particular, la Pathfinder adquirida por la recurrida. Valga apuntar que, si se tratara de generalizar sobre lo indicado en la determinación de hechos decimocuarta, a lo sumo, podría interpretarse que el dealer es *muy eficiente* al reparar los vehículos.

Digo que ni siquiera nos debimos ocupar con este asunto porque, además de la premisa estar montada en una especulación insostenible, el DACo no concedió remedio alguno referente al vehículo Ford Escape aludido, ni tampoco tuvo peso alguno en la decisión recurrida la determinación de hecho aludida.

b.

Nos propone Car Auto, Inc. en su segundo señalamiento de error que, por cuanto el foro administrativo tuvo ante su atención sendos informes periciales sobre el vehículo alegadamente defectuoso, no cabía tomar en consideración el testimonio de un testigo lego, (el de la recurrida), acerca de tal tema. Se equivoca.

Nuestro Tribunal Supremo ha reiterado que los tribunales *tienen amplia discreción en la apreciación de la prueba pericial pudiendo, aun, adoptar su propio criterio en la apreciación o evaluación de la misma y hasta descartarla aunque resulte técnicamente correcta. Valdejulli Rodríguez v. AAA*, 99 DPR 917 (1971); *Prieto v. Maryland Casualty Co.,*



---

[2] Recurso de revisión judicial, pág. 7.

98 DPR 594 (1970). El juzgador de los hechos no está obligado a aceptar las conclusiones de un perito. S.L.G. v. Mini-Warehouse, 179 DPR 322, 346 (2010). Si luego de evaluar el testimonio pericial, el juzgador concluye que no le merece credibilidad, tendrá la facultad de rechazarlo. Id. A lo que se une que *la evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley.* Regla 110(d) de Evidencia, 32 LPRA Ap. VI.

Pero, más aún, nuestro Tribunal Supremo ha identificado como uno de los propósitos fundamentales del proceso administrativo, para que sea ágil y sencillo, el de permitir la participación de **personas legas**, dando a estas un uso eficiente de los remedios concedidos por las agencias. *Otero v. Toyota* 163 DPR 716, 733 (2005). En el contexto de las acciones por vicios ocultos al momento de un consumidor comprar un auto en particular, el mismo alto Foro ha advertido que **el comprador no perito** *solo viene obligado a demostrar que al momento de la compraventa el automóvil funcionaba normalmente y que el vendedor no quiso o no pudo corregir el defecto, a pesar de haber tenido la oportunidad de hacerlo. Polanco v. Cacique Motors,* 165 DPR 156 (2005) [3].

Por tanto, el foro administrativo **no** estaba atado, en modo alguno, a las conclusiones alcanzadas por los peritos, si, sopesada la totalidad de la prueba que tuvo ante su consideración, se logró establecer que al momento de la compraventa del automóvil en este caos, funcionaba normalmente, y que el vendedor no quiso o no pudo corregir el defecto, a pesar de haber tenido la oportunidad de hacerlo. *Polanco v. Cacique Motors,* supra. **Las determinaciones de hechos alcanzadas por el DACo revelan que, a través del testimonio de la recurrida, al cual el foro administrativo dio entera credibilidad, se demostró con holgura tal requerimiento.** En este sentido, DACo estaba perfectamente



---

[3] En la misma Opinión se estableció que *el estándar jurídico para resolver un contrato de compraventa de vehículos de motor nuevo es igualmente aplicable a los vehículos usados. Polanco v. Cacique Motors,* supra.

habilitado para concederle mayor peso probatorio al testimonio de la recurrida sobre los desperfectos del vehículo, (que esta percibió con sus sentidos), que a los informes periciales aludidos.

Además, sépase que, a pesar de que en este caso la parte recurrente presentó la transcripción de la prueba oral, no citó segmento de su contenido para tratar de impugnar las declaraciones de la recurrida, mucho menos superar la presunción de corrección que acompaña a las determinaciones de hechos realizadas por las agencias administrativas. *Graciani Rodríguez v. Garage Isla*, LLC., 202 DPR 117 (2019). Nótese que las determinaciones de hechos incluidas en la Resolución recurrida fueron muy precisas, específicas, al describir todos los eventos desafortunados que la recurrida confrontó con el vehículo claramente defectuoso que le fue vendido por Car Auto y ameritaban la resolución del contrato de compraventa. Es decir, a partir de las determinaciones de hechos realizadas por el DACo, que tuvieron como fundamento concederle credibilidad al testimonio de la recurrida, se demostró, con creces, que al momento de la compraventa el automóvil funcionaba normalmente y que el vendedor no quiso o no pudo corregir el defecto, a pesar de haber tenido la oportunidad de hacerlo. *Polanco v. Cacique Motors*, supra.

A pesar de lo anterior, el Panel al cual estoy adscrito, **no limitó su intervención a evaluar si la agencia sostuvo su decisión en el principio rector de evidencia sustancial, o si actuó de forma ilegal o arbitraria, sino que descartó y sustituyó las determinaciones de hechos del DACo por las suyas.** *Otero v. Toyota*, supra. Del Panel haber detectado que la prueba pericial resultaba conflictiva respecto a la prueba testifical, debía reconocer que **no** nos correspondía dirimir tal conflicto, siendo tal función del foro ante el cual desfiló la prueba, sino que correspondía respetar la determinación que sobre ello alcanzó la agencia. Id. Simplemente, en la Sentencia de este Panel no se incluyó un

análisis sobre si el dictamen recurrido fue razonable, a pesar de la abundante jurisprudencia que lo ordena y que también advierte que no debemos sustituir el criterio de la agencia especializada por el nuestro.

Finalmente, como mencioné, tampoco se reconoce en la Sentencia del Panel la trayectoria jurisprudencial acerca de los derechos del consumidor a reclamar por los defectos de un vehículo ante los vendedores, y la reconocida pericia del DACo para adjudicar los tales. Al respecto, véanse los ya citados *Graciani Rodríguez v. Garage Isla Verde,* supra; *Otero v. Toyota,* supra; *Polanco v. Cacique Motors,* supra[4]; *Rebollo v. Yiyi Motors,* supra; *Ferrer v. General Motors Corp.,* 100 DPR 246, (1971).

En definitiva, estoy convencido de que la *Resolución* recurrida fue razonable, sostenida por evidencia sustancial, la cual requería nuestra deferencia. En consecuencia, muy respetuosamente disiento del curso decisorio seguido por este Tribunal de Apelaciones, hubiese *Confirmado.*

Por las razones expuestas, respetuosamente disiento.

En San Juan, Puerto Rico, a 13 de mayo de 2025.

Nery Enoc Adames Soto
Juez de Apelaciones

---

[4] Con relación al señalamiento de error tercero, se debe conocer que en esta Opinión el Tribunal Supremo indicó, en lo pertinente que, por dicho caso tratarse de uno de vicios ocultos, independientemente de la garantía pactada por las partes, el DACo podía ordenar la resolución del contrato de compraventa. *Íd.,* pág. 170.